**SBAITI & COMPANY PLLC**
Mazin A. Sbaiti, Esq.
California Bar No. 275089
Dallas Renaissance Tower
1201 Elm Street, Suite 4010
Dallas, Texas 75270
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com

**Counsel for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPICE JAZZ LLC,<br><br>Plaintiff,<br><br>vs.<br><br>YOUNGEVITY INTERNATIONAL, INC.,<br>BIANCA REYNE DJAFAR-ZADE<br>and JOHN DOES 1-10,<br><br>Defendants. | § Case No. 3:19-cv-00583-BAS-WVG<br>§<br>§ **PLAINTIFF'S MEMORANDUM**<br>§ **IN OPPOSITION TO DEFENDANT**<br>§ **YOUNGEVITY INTERNATIONAL,**<br>§ **INC.'S MOTION TO DISMISS**<br>§<br>§<br>§<br>§<br>§ Hearing Date: August 26, 2019<br>§ Courtroom: 4B<br>§ Judge: Hon. Cynthia Bashant<br>§<br>§ |

Plaintiff Spice Jazz LLC submits this memorandum in opposition to Defendant Youngevity International, Inc.'s motion to dismiss, and would respectfully show the Court:

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................1

II. FACTUAL BACKGROUND .................................................................2

III. ARGUMENT ..........................................................................................4

  A. Ms. Walters is Not an "Indispensable" Party Under Any of the
     Prongs of Rule 19, and the Mere Existence of an Arbitration
     Agreement with One Defendant Does Not Lead to the Automatic
     Dismissal of Claims Against Remaining Defendants....................4

    1. Under the First Prong of Rule 19, Ms. Walters
       is Not a Necessary Party Because the Court Can
       Grant Plaintiff Full Relief in This Even In
       Ms. Walters' Absence ................................................................5

    2. Under the Second Prong, Ms. Walters is Not
       "Indispensable" Because She Does Not Claim
       Any Interest Relating to This Action ........................................5

    3. Even If Ms. Walters Were A Necessary Party,
       Which She Is Not, the Court Should Exercise Its
       Discretion Under Rule 19(b) To Allow This
       Proceeding to Move Forward Without Her ...............................8

  B. Plaintiff Sufficiently Alleges Actionable Claims ......................11

    1. Trade Secret Misappropriation (Counts 7, 8, 9 and 10)...........11

    2. "Negligent" Trade Secret Misappropriation (Counts 7, 9) .....14

    3. Negligent Interference with Contracts (Count 3)....................15

    4. Intentional Interference with Contracts (Count 4) ..................16

    5. Intentional Interference with Prospective Economic
       Advantage (Count 6) ...............................................................20

    6. Negligent Interference with Prospective Economic
       Advantage (Count 5) ...............................................................22

    7. Aiding and Abetting Breach of Fiduciary
       Duty (Count 11) ......................................................................23

1

8.  Unjust Enrichment/Restitution (Count 12) ...............................................24

C.  If the Court Determines That There Are Any Defects in the
First Amended Complaint, It Should Grant Leave to Amend
So That Plaintiff's Claims Can Be Judged on Their Factual Merits ..........25

IV.  CONCLUSION ................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*1-800-Got Junk? LLC v. Superior Court*, 189 Cal. App. 4th 500
116 Cal. Rptr. 3d 923, 931 (2010) ................................................................. 18

*Alaska Stock, LLC v. Pearson Educ., Inc.*, No. 3:11-cv-00162-TMB,
975 F.Supp.2d 1027, 2013 WL 5496788, (D. Alaska 2013) ........................... 10

*Cahill Dehe Band of Wintun Indians of the Colusa Indian
Cmty. v. California*, 547 F.3d 962 (9th Cir. 2008) ......................................... 6

*Camacho v. Major League* Baseball, 297 F.R.D. 457
(S.D. Cal. 2013) ......................................................................................... 6-9

*Congdon v. Uber Techs.*, 226 F. Supp. 3d 983
(N.D. Cal. 2016) ............................................................................................ 10

*Davis v. Nadrich*, 174 Cal. App. 4th 1
Cal. Rptr. 3d 414 (Ct. App. 2009) ................................................................. 22

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.*,
375 F.3d 861 (9th Cir. 2004) ........................................................................... 5

*DRK Photo v. McGraw-Hill Cos.*, No. CV 12-8093-PCT-PGR,
2014 U.S. Dist. LEXIS 78864 (D. Ariz. 2014) .............................................. 10

*Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350
Cal. Rptr. 3d 682 (Ct. App. 2010) .............................................................. 24-25

*Fifield Manor v. Finston,* 54 Cal 2d 632 (1960) ............................................. 15

*Flintkote Co. v. Aviva PLC,* 177 F. Supp. 3d 1165 (N.D. Cal. 2016) .................. 10

*Forman v. Davis*, 371 U.S. 178, 83 S. Ct. 227, 230 (1962) ............................... 25

*Greenly v. Sara Lee Corp.*, 2006 U.S. Dist. LEXIS 90868
(E.D. Cal. 2006) ............................................................................................. 15

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. SACV-11-1062,
2015 WL 13357646, (C.D. Cal. May 6, 2015) ............................................... 11

*Kenner v. Kelly*, 2012 WL 553943 (S.D. Cal. Feb. 21, 2012) ...............................21

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134, 1153 (2003) ........................................................16

*Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328 (2014) .......................23

*Nelson Bros. Prof'l Real Estate LLC v. Jaussi*, No. SA CV 17-0158,
  2017 WL 8220703, 2017 U.S. Dist. LEXIS 219769
  (C.D. Cal. 2017)..................................................................11

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459 (1992) ...........................17

*Nestle USA, Inc. v. Crest Foods, Inc.*, 2017 WL 3267665
  (C.D. Cal. July 28, 2017).........................................................21

*Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658 (2003) ...................11

*SL Montevideo Tech, Inc. v. Eaton Aero., LLC*, No. 03-3302 (RHK/FLN),
  2005 U.S. Dist. LEXIS 16650 (D. Minn. 2005).........................................14

*Snelling Servs., LLC v. Diamond Staffing Servs.*, No. A135049,
  2013 Cal. App. Unpub. LEXIS 5425 (2013) ..........................................20

*Torrance National Bank v. The Aetna Casualty & Surety Company*,
  251 F.2d 666 (9th Cir.1958) .......................................................16

*Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 Tex. App. LEXIS 3398,
  (Tex. App.—Fort Worth Mar. 27, 2014).............................................19

*Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344
  28 Cal. Rptr. 3d 463, 467-68 (Ct. App. 2005)........................................15

**Statutes**

California Uniform Trade Secret Act (Cal. Civ. Code § 3426) ........... 14-15, 20-21

Defend Trade Secrets Act of 2016 ........................................... 14-15

18 U.S.C.S. § 1839 ........................................................14

**Rules**

Fed. R. Civ. P. 15(a)(2) ................................................................25

Fed. R. Civ. P. 19........................................................................passim

Fed. R. Civ. P. 19(a)(1)(A) ..........................................................5

Fed. R. Civ. P. 19(a)(1)(B) ..........................................................5

# I.

## **PRELIMINARY STATEMENT**

Plaintiff Spice Jazz LLC owned culinary recipes and spices which it offered to customers in Australia, New Zealand, the United States and elsewhere.  It did this through an international direct-sales force, in which a handful of key employees were entrusted with trade-secret recipes, marketing materials and a proprietary database of customers.  These trade secrets gave Plaintiff a competitive advantage and were kept confidential from both: (a) Plaintiff's ordinary contractors, (b) the general public and (c) Plaintiff's competitors.

In a nutshell, Defendant Youngevity International, Inc. ("Youngevity") stole all of Plaintiff's key employees/most successful contractors and destroyed Plaintiff's entire business in the process, by conspiring with Plaintiff's CEO, Colleen Walters, while she was still collecting a salary from Plaintiff.  Youngevity convinced Ms. Walters not only to move to Youngevity herself, but in the process, to bring all of Plaintiff's most successful sales reps, key employees, and contractors with her. In the process, Ms. Walters and all the sales reps and employees who moved with her took Plaintiff's proprietary recipes, marketing materials and customer information with them – Plaintiff's entire business.

This conspiracy was planned and carried out over the course of many months, with Youngevity's knowledge and assistance. While Ms. Walters was still acting as Plaintiff's CEO, she and Youngevity were planning Plaintiff's demise.  Within a few months of this mass desertion and accompanying theft of trade secrets, Plaintiff's business went from millions of dollars in annual revenues to liquidation and bankruptcy.

Youngevity seeks to evade liability for its misconduct by stretching and distorting the law.  For the reasons explained below, Youngevity's arguments are erroneous and its motion to dismiss should be denied in its entirety.  In the alternative, if the Court decides that there are defects in the claims as currently pled,

Plaintiff respectfully asks for the opportunity to cure through further amendment.[1]

## II.

## FACTUAL BACKGROUND

The dispute between Plaintiff and Youngevity is summarized in the above Preliminary Statement, which appears in the Introduction to the First Amended Complaint ("FAC"), ¶¶ 1-3.  As explained above, the gravamen of Plaintiff's complaint against Youngevity is that it actively conspired with Plaintiff's CEO, *while she was still employed by Plaintiff*, to steal all of Plaintiff's key employees and sales force members and most of Plaintiff's trade secrets.

The allegations against Youngevity include the following:

- Youngevity's officers and directors conspired with Ms. Walters and specifically discussed and agreed a plan to sabotage Plaintiff's business operation and steal all of its key employees, sales force members and trade secrets and transfer them to Youngevity. *Id.* ¶ 25.

- As will be revealed in greater detail by discovery, Ms. Walters and individuals at Youngevity, including unknown Youngevity officers and directors, discussed and agreed to a plan through which Ms. Walters would orchestrate the theft of Plaintiff's entire business by moving all of Plaintiff's key sales people and employees and all of Plaintiff's trade secrets from Plaintiff to Youngevity, its direct competitor.  Youngevity reached this agreement with Ms. Walters while she was still working as Plaintiff's CEO, and the conspiracy was carefully planned and carried out over many months while Ms. Walters continued collecting her salary from Plaintiff.  Ms. Walters and

---

[1] Plaintiff has exercised its right to amend once without leave of Court, in an attempt to address the issues raised by Youngevity and narrow the issues before the Court.  **Contrary to the statement at 4:5-7 of Youngevity's brief, Plaintiff's counsel *never* "represented that they would not amend."**  Apparently, there was some miscommunication during the phone call between counsel.  In any event, Plaintiff respectfully requests that if the Court determines that further amendment could cure defects in the Amended Complaint, it grant Plaintiff an opportunity to amend once more in response to the Court's ruling, in order for Plaintiff's claims to be decided on their factual merits.

Defendants were effectively charging Plaintiff for the privilege of being robbed of tens of millions of dollars. *Id.* ¶ 34.

- With Defendants' full knowledge, and as agreed with Defendants, Ms. Walters was able to convince Plaintiff's key sales people to move with her to Youngevity, and bring with them roughly 50-100 key employees and members of the sales force, thereby successfully transferring all or substantially all key members of Plaintiff's sales force to Youngevity. *Id.* ¶ 35.

- Ms. Walters orchestrated this scheme, which took several months to properly plan and carry out, while still employed by Plaintiff, and while still collecting a substantial (albeit clearly inadequate in her eyes) salary as Plaintiff's CEO. *Id.* ¶ 36.

- Ms. Walters and all of the sales force members and employees who moved also took with them the proprietary sales channels, recipes, marketing materials and strategies that they had access to and in her possession as CEO, transferring these materials directly to her new employer. *Id.* ¶ 37.

- Ms. Walters' stab in the back was so successful that it decimated Plaintiff's entire business operations. As a result, Plaintiff's revenues, which had previously been in the seven figures annually and projected to continue growing, collapsed to zero, or close to zero, within one quarter. *Id.* ¶ 38.

- Youngevity and its Officers and Directors hired *en masse* not only their competitor's CEO but roughly 50-100 key members of their competitor's sales force and allowed all of these employees and sales force members to bring proprietary sales channels, recipes and trade secrets with them. *Id.* ¶ 39.

- In the process, Youngevity no doubt incentivized their move by offering the key sales force members more lucrative contracts than the ones they have with Spice Jazz. *Id.* ¶ 40.

- Through this whole process, Youngevity and its Officers and Directors intentionally interfered with Plaintiff's contracts with its sales force members and intentionally misappropriated Plaintiff's trade secrets, by inducing Ms. Walters to move to Youngevity and to organize the transfer of roughly 50-100 key members of Plaintiff's sales force and the transfer of all of Plaintiff's proprietary recipes, marketing strategies and sales channels to Youngevity. Youngevity and its Officers and Directors expressly discussed Ms. Walters' planned move to Youngevity with Ms. Walters while she was still Plaintiff's CEO, and planned with her how she would successfully transfer the key members of the sales force as well as Plaintiff's trade secrets. *Id.* ¶ 41.

- In the alternative, Youngevity and its Officers and Directors did not have the good sense to realize that Youngevity was negligently benefiting from, and aiding and abetting, a massive, wrongful theft. *Id.* 42.

### III.

### <u>ARGUMENT</u>

**A.**     **Ms. Walters is Not An "Indispensable" Party Under Any of the Prongs of Rule 19, and the Mere Existence of an Arbitration Agreement with One Defendant Does Not Lead to the Automatic <u>Dismissal of Claims Against Remaining Defendants</u>**

Youngevity's Rule 19 argument, arguing for dismissal on the basis that Plaintiff's former CEO, Ms. Walters, is an "indispensable party," has no merit. Indeed, the biggest "stretch" Youngevity offers the Court in this motion is its argument that the mere existence of an arbitration agreement between Plaintiff and Ms. Walters—which in theory applies to Plaintiff's claims against her—somehow leads to *the dismissal with prejudice* of claims against her co-defendant, Youngevity.

If that were the case, then arbitration agreements would always lead to the wholesale dismissal of claims against the arbitrating party's co-defendants. Needless to say, that is not the law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1. Under the First Prong of Rule 19, Ms. Walters is Not a Necessary Party Because the Court Can Grant Plaintiff Full Relief in This Even in Ms. Walters' Absence

Under Rule 19, there are several distinct prongs under which a party can be determined to be a "necessary party," none of which are satisfied here.  Under the Rule's first prong, a party may be necessary if "complete relief among existing parties cannot be granted in its absence."  Fed. R. Civ. P. 19(a)(1)(A).  A "court asks whether the absence of the party would preclude the district court from fashioning meaningful relief." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 879 (9th Cir. 2004). This prong does not apply to this case, because the Court can order Youngevity and its John Does to pay damages to Plaintiff regardless of whether Ms. Walters is ever a party to this proceeding.  <u>Ms. Walters' absence does not in any way hamper the Court's ability to grant Plaintiff the relief it seeks</u> against Youngevity and its yet-to-be-identified John Does.

### 2. Under the Second Prong, Ms. Walters is Not "Indispensable" Because She Does Not Claim Any Interest Relating to this Action

Second*,* a party may be indispensable if it "claims an interest relating to the subject of the action" and its "absence may (i) . . . impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B).  This prong plainly does not apply here, because <u>Ms. Walters does not have any legal interest in the outcome of Plaintiff's proceeding against Youngevity</u>.  Stated simply, whether Youngevity and its John Does are ordered to pay damages to Plaintiff does not impact Ms. Walters.  She is a separate defendant, in a separate arbitration.

Moreover, the second prong of Rule 19 has two additional sub-prongs, at least one of which has to be satisfied for a party to be "necessary": there must either be a risk to "impair or impede [Ms. Walter's] ability to protect the interest" which she does not have here, or else there must be a risk of "inconsistent obligations" being

imposed on another party as a result of Ms. Walters' absence.  *Id.*  Neither of these required sub-prongs are satisfied.

Turning first to the "inconsistent obligations" sub-prong, the case Youngevity cites, *Camacho v. Major League Baseball*, explains that:

> **The Ninth Circuit has stated that: '[i]nconsistent obligations' are not . . . the same as inconsistent adjudications or results.** Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum. 297 F.R.D. 457, 462 (S.D. Cal. 2013) (emphasis added) (quoting *Cahill Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 976 (9th Cir. 2008)).

Taking into account the Ninth Circuit's clarification of the difference between "inconsistent adjudications or results" and "inconsistent obligations," this sub-prong clearly is not satisfied here.  Say for instance that this Court were to find Youngevity and its John Does liable for aiding and abetting breaches of Ms. Walters' fiduciary duties, while the arbitrators simultaneously found that Ms. Walters did not even breach her fiduciary duties.  <u>The Ninth Circuit says that is perfectly fine</u>.  *Cahill*, 547 F.3d at 976.  "[I]nconsistent adjudications or results" are permitted under Rule 19. *Id.*

Such an outcome would produce "inconsistent adjudications or results," but it *would not* expose any of the parties involved to a situation in which "a party is unable to comply with one court's order without breaching another court's order." *See id.* Accordingly, Rule 19 concerns are not implicated under this sub-prong. *Id.*

Turning to the alternative sub-prong which involves situations where a party's "absence may (i) . . . impair or impede the person's ability to protect the interest" they have in the proceeding (which here, Ms. Walters has none), the case cited by Youngevity, *Camacho*, offers a perfect illustration of how this sub-prong operates. *Camacho* involved a situation in which:

1

2

> In the complaint, **Plaintiffs explicitly state that they desire 'a declaration as to whether or not Pesqueira is bound to the Red Devils of Mexico.'** (*Id.* ¶ 68.) . . .

3

4

5

6

> [But] Neither the Red Devils nor the Mexican League are represented in this action, and a determination by this Court regarding the validity of the Red Devils contracts may impair and impede the Red Devils' and the Mexican League's legally protected interest in this suit. *Camacho*, 297 F.R.D. at 461-62 (emphasis added).

7

8

9

Unsurprisingly, the Court in *Camacho* determined that it could not issue a Declaratory Judgment adjudicating "whether or not Pesqueira is bound to the Red Devils" without the Red Devils being present to defend their rights. *Id.*

10

11

12

13

14

15

16

17

By contrast, here, Plaintiff is not seeking to obtain any Declaratory Judgment that impairs Ms. Walters' rights or interests. It would be an obviously unfair play, for instance, if Plaintiff were to ask this Court to issue a Declaratory Judgment stating that Ms. Walters' contract with Plaintiff was *invalid*, without joining Ms. Walters. However, Plaintiff does not ask for any such relief—or, indeed, any Declaratory Judgment regarding the status of Ms. Walters' agreements. Indeed, Plaintiff does not seek any relief against Ms. Walters here. She is party to a separate arbitration.

18

19

20

21

Although Youngevity attempts to raise an argument that *Plaintiff cannot recover from Youngevity for tortious interference* because the underlying contract with Ms. Walters is supposedly invalid, Youngevity also does not seek a Declaratory Judgment on this issue. *Compare Camacho,* 297 F.R.D. at 461-62.

22

23

24

25

Indeed, if it sought such relief—a declaration from this Court adjudicating the contract as invalid—Youngevity would have to join Ms. Walters under Rule 19 — and it would have the ability to do so, because there is no arbitration agreement between Youngevity and Ms. Walters.

26

27

To be clear, Youngevity is not seeking any relief against Ms. Walters, it is only asking this Court to dismiss a tortious interference claim against Youngevity.

28

Ms. Walters has no legally recognized interest to protect in this proceeding, which is a fight between Plaintiff and Youngevity, wholly separate from the simultaneous fight occurring (in arbitration) between Plaintiff and Ms. Walters. Whether Youngevity and its John Does are found liable does not impact Ms. Walters.  She is in no way a "necessary party" and no claims against Youngevity should be dismissed.

### 3. Even If Ms. Walters Were a Necessary Party, Which She Is Not, the Court Should Exercise Its Discretion Under Rule 19(b) To Allow This Proceeding to Move Forward Without Her

Moreover, even if Youngevity could satisfy any of the standards for finding a party to be "necessary" to litigation (which it cannot), the Court still should not dismiss any of Plaintiff's claims against Youngevity.  The Court's inquiry does not stop with determining whether any of the prongs and sub-prongs of Rule 19(a) are satisfied.  Rule 19(b) states that: "If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Accordingly, dismissal is not mandatory, even when a "necessary party" cannot be joined. *Id.*

As explained above, Ms. Walters has no interest in the outcome of this proceeding.  She will not be affected by whether Youngevity and its John Does are ordered to pay damages.

However, even if Youngevity had satisfied its burden to demonstrate that Ms. Walters was a "necessary party," Rule 19(b) requires the Court to determine whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.*  As Youngevity's case, *Camacho*, explains, the factors for the Court to consider are: "(1) prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party;

and (4) whether there exists an alternative forum." *Camacho*, 297 F.R.D. at 463.

Here, all four factors weigh strongly against the premature dismissal of Plaintiff's claims without consideration of their merits. There is clearly no alternative forum where both Youngevity and Ms. Walters can be joined as co-defendants, because Ms. Walters has an arbitration agreement with Plaintiff, and Youngevity does not. As for prejudice, Plaintiff would be deeply prejudiced if any of its claims were dismissed regardless of their factual merits. (Compounding this prejudice, the likelihood that Plaintiff can obtain any monetary recovery from Ms. Walters—who is in Australia and believed to have no assets available to satisfy a judgment—is virtually nil).

Moreover, discovery can be sought from Ms. Walters as a non-party, just like non-parties in any other proceeding. Youngevity has not cited any case supporting its radical argument that *the mere fact that a key witness is a non-party who must be served with a subpoena should lead to the dismissal, with prejudice*, of claims against Youngevity. Indeed, it is routine for lawsuits to move forward in which a keep witness is a non-party, who must be served with a subpoena.

The third factor is not implicated at all, because the Court can fashion complete relief between Plaintiff and Youngevity in Ms. Walters' absence. Either Youngevity will be ordered to pay damages, or it will not.

As for the fourth factor ("whether relief can be shaped to lessen prejudice"), if the Court issues a ruling on the issue of whether the contract between Ms. Walters and Plaintiff is legally valid, *for the limited purpose of determining whether Plaintiff can pursue a tortious interference claim against Youngevity*, the Court can make clear that it is not issuing a declaratory judgment, enforceable against Ms. Walters, concerning the validity of her contract; or impacting any of Ms. Walters' rights or obligations thereunder. The only question before the Court is whether a tortious interference claim against Youngevity can proceed, based on interference with Ms. Walters' contract with Plaintiff (setting aside the separate issue of Youngevity's

interference with all of Plaintiff's contracts with its sales force members).

Moreover, when some parties to a dispute are bound by an arbitration agreement and others are not, it is not at all uncommon for a federal lawsuit to proceed in parallel with an arbitration proceeding arising from the same dispute. Here are a few examples among many: *DRK Photo v. McGraw-Hill Cos.*, No. CV 12-8093-PCT-PGR, 2014 U.S. Dist. LEXIS 78864, at *19 (D. Ariz. 2014) (referring to decisions issued in *Alaska Stock, LLC v. Pearson Educ., Inc.*, No. 3:11-cv-00162-TMB, 975 F.Supp.2d 1027, 2013 WL 5496788, at *5-7 (D. Alaska 2013) and in a simultaneous, parallel arbitration proceeding); *Congdon v. Uber Techs.*, 226 F. Supp. 3d 983, 991 (N.D. Cal. 2016) (noting that "regardless of the outcome of the arbitration, the claims of the Opt-Out Plaintiffs will need to be litigated in this court. Uber has not presented the Court with any authority indicating that the decision of the arbitrators with respect to the Non-Opt-Out Plaintiffs would in some way bind the Court … Additionally, Uber has presented no convincing arguments that proceeding with the litigation as to the Opt-Out Plaintiffs would in some way negatively impact or undermine the parallel arbitration proceedings . . ."); *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178 (N.D. Cal. 2016) (referring to "parallel arbitration proceedings" and choosing to reach the same decision as the arbitrator on a choice-of-law question, "so as to uniformly apply California law to these policies").

That is the proper course to take here: for the arbitration and this lawsuit to proceed in parallel.  There is no reason for the Court to take the radical step of dismissing claims against Youngevity with prejudice at the opening stage of this proceeding.

## B.   **Plaintiff Sufficiently Alleges Actionable Claims**

### 1.  **Trade Secret Misappropriation (Counts 7, 8, 9 and 10)**

To claim misappropriation of trade secrets, Plaintiff must allege that "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the

plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. SACV-11-1062, 2015 WL 13357646, at *2 (C.D. Cal. May 6, 2015) (quoting *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003)).

The First Amended Complaint adequately alleges each of these elements. As the *Nelson* case cited by Youngevity explains: "[a] party in a trade secrets case 'does not have to spell out the details of the trade secret,' but the party does need to 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade . . . and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Nelson Bros. Prof'l Real Estate LLC v. Jaussi*, No. SA CV 17-0158-DOC (JCGx), 2017 WL 8220703, 2017 U.S. Dist. LEXIS 219769, at *11 (C.D. Cal. 2017).

Plaintiff's trade secrets consisted of: (1) proprietary spice blends and recipes; (2) proprietary marketing techniques and materials; and (3) a proprietary database of customer names and contact information. First Amend. Compl. ¶ 19. All three gave Plaintiff an advantage over its competitors, were not known to the general public or to competitors and were kept secret. *Id.*

Plaintiff's proprietary spice blends and recipes were stored on a spreadsheet that only roughly 4-5 key employees (including Ms. Walters) had access to. *Id.* ¶ 20. That spreadsheet was kept on password-protected computers inside a locked office. *Id.* Plaintiff's key employees were instructed to keep the spreadsheet secret from both the general public and Plaintiff's competitors. *Id.*

Plaintiff's sales force members were able to sell the products, but did not have access to the proprietary blends and recipes themselves (*i.e.* to recreate them). *Id.* All they could do was sell the finished products.

Ms. Walters was able to steal these blends and recipes and move them to Youngevity by stealing the spreadsheets on which they were recorded. *Id.* Youngevity conspired with Ms. Walters to accomplish the theft, and Plaintiff

suffered damages as a result.  *Id.* ¶¶ 2, 3, 29.

Moreover, since moving to Youngevity, Ms. Walters has been seen at trade shows marketing products that appear identical, and are identically named, to proprietary products that were developed for Plaintiff. *Id.* ¶ 21.   These include Moroccan Mint Tea, Hawaiian Hibiscus Tea, Egyptian inspired Dukkah, Japanese inspired Dukkah, Mediterranean inspired Dukkah, lime olive oil, garlic olive oil and Youngevity's underline("entire") "Saveur" line of products. *Id.*   These are merely examples of trade secrets which Ms. Walters, with Youngevity's assistance, is known to have misappropriated; the full list of misappropriated products will be revealed through discovery. *Id.*

Plaintiff's sales force members were also taught sales pitches and techniques that Plaintiff developed.   *Id.* ¶ 22.   These sales techniques were developed specifically for Plaintiff and were known to Ms. Walters and to Plaintiff's sales directors, who would teach the techniques to sales force members. *Id.*  This included specific training for sponsoring, host coaching, selling products, trade shows and markets and fundraising. *Id.*   The techniques were complemented by proprietary marketing materials such as brochures, catalogues and PowerPoints that Plaintiff developed. *Id.* These proprietary materials were maintained on password-protected computers kept in a locked office, and were shared through a secure Dropbox account which permitted invitees to be granted varying levels of access to Plaintiff's confidential materials. *Id.*  Ms. Walters was able to steal these proprietary techniques and materials by taking the files with her when she moved to Youngevity, and by taking the proprietary techniques she developed for Plaintiff and  teaching them to Youngevity's sales force herself as well as by convincing numerous of Plaintiff's sales directors to move with her to the new company. *Id.*

Youngevity conspired with Ms. Walters to accomplish the theft, and Plaintiff suffered damages as a result.  *Id.* ¶¶ 2, 3, 29.

1   Finally, Plaintiff also maintained a proprietary database of consumer names
2   and contact information. *Id.* ¶ 23.  This database was maintained by Plaintiff's
3   program manager, who never agreed to join the conspiracy between Ms. Walters and
4   Youngevity. *Id.*  As a result of this fact, Ms. Walters and her con-conspirators were
5   unable to steal the database itself; however, she instructed her sales directors to store
6   a copy of their "downlines" (the names and contact information of the sales
7   representatives under them, and of all their customers) in order to move that
8   information to  Youngevity, and in this manner was able to recreate the majority of
9   the proprietary database and move it to Youngevity. *Id.*

10   Youngevity conspired with Ms. Walters to accomplish the theft, and Plaintiff
11   suffered damages as a result.  *Id.* ¶¶ 2, 3, 29.

12   Youngevity appears to misapprehend what Plaintiff means by "customer"
13   when it writes that: "Customer lists, particularly in the direct marketing industry, are
14   essentially a matter of public knowledge because the direct marketing company's
15   'customers' are also its salespeople." Mem. At 20:26-27:1. However, these are not
16   the "customers" Plaintiff is referring to.  Plaintiff is referring to the individuals who
17   actually purchased Plaintiff's products, from its salespeople.  *See* FAC ¶ 23.

18   Moreover, the First Amended Complaint makes clear that Youngevity
19   acquired all of Plaintiff's above-described trade secrets through <u>improper means</u>.
20   Indeed, it alleges that Youngevity actively conspired with Ms. Walters to steal these
21   trade secrets.  FAC ¶ 2. (However, in addition to the conspiracy allegations, it also
22   beggars belief that, when hiring Ms. Walters, Youngevity "did not know" that Ms.
23   Walters was merely a corporate officer of Spice Jazz, and not the actual *<u>owner</u>* of all
24   the trade secret blends and recipes, sales techniques and consumer database she
25   brought with her).

26   The First Amended Complaint adequately alleges theft of trade secrets; in the
27   alternative, if the Court believes that further detail is required, it should grant leave
28   for Plaintiff to amend its pleading one time in response to the Court's ruling.

### 2.  "Negligent" Trade Secret Misappropriation (Counts 7, 9)

Youngevity argues that there is no negligent trade-secret misappropriation. However, it is undisputed that under both the California Uniform Trade Secrets Act (CUTSA) and Defend Trade Secrets Act of 2016 (DTSA), misappropriation includes both: (1) "[a]cquisition of a trade secret of another by a person who knows **or has reason to know** that the trade secret was acquired by improper means" and (2) "use of a trade secret of another . . . by a person who: (B) At the time of . . . use, knew **or had reason to know** that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Cal. Civ. Code §§ 3426.1(b)(1); 3426.1(b)(2)(B); *see also* 18 U.S.C. § 1839(5).

Thus, although the courts refer to trade secret misappropriation as an intentional tort, it is enough that the defendant "<u>had reason to know</u>" that either the trade secret was acquired by improper means, or was acquired from a person who had a duty not to divulge it, to satisfy the statute. *Id*.  "The existence of a trade secret is not negated merely because [a] person has acquired the trade secret without express or specific notice that it is a trade secret if, under the circumstances, [that] person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret be maintained." *SL Montevideo Tech., Inc. v. Eaton Aero., LLC*, No. 03-3302 (RHK/FLN), 2005 U.S. Dist. LEXIS 16650, at *36 (D. Minn. 2005).  Determining whether the defendant had "reason to know" it had acquired the trade secret wrongfully involves a "totality of the circumstances" analysis, similar to negligence even if it is not expressly called negligence. *See id.*

Plaintiff's purpose in segregating Counts 7 and 9 from Counts 8 and 10 was to emphasize that it was seeking to hold Youngevity and its John Does liable not

merely if they <u>intentionally conspired</u> with Ms. Walters, but also if they acquired Plaintiff's trade secrets under circumstances under which they had "reason to know" that Ms. Walters had acquired the trade secrets improperly, such as by secreting them away from Plaintiff, or in violation of a duty she owed Plaintiff.

To the extent the use of the word "negligence" is improper or confusing, Plaintiff respectfully seeks leave to amend to clarify that Counts 7 and 9 are based on Defendant and its Officers and Directors having had "reason to know," under the totality of the circumstances, that their actions were in violation of CUTSA and the DTSA, even if the mental state associated with having had "reason to know" is not technically referred to as negligence.

### 3. Negligent Interference with Contracts (Count 3)

Youngevity does not challenge the Complaint's sufficiency as to negligent interference with contracts. Instead, it cites a sixty-year-old California Supreme Court decision, *Fifield Manor v. Finston*, 54 Cal 2d 632 (1960), for the proposition that California law does not recognize a claim for negligent interference with contract (only intentional interference), along with a few cases that have recognized that *Fifield* has not been expressly overruled.

However, an old State Supreme Court decision does not have to be expressly overruled to fail to represent the current state of California law. Several more recent decisions have recognized a cause of action in California for negligent interference with contract. *See Woods v. Fox Broad. Sub., Inc.,* 129 Cal. App. 4th 344, 350, 28 Cal. Rptr. 3d 463, 467-68 (Ct. App. 2005) ("Our courts recognize four types of claims for interference with contractual rights or expectancies: Intentional or negligent interference with an existing contract and intentional or negligent interference with prospective economic advantage."); *Greenly v. Sara Lee Corp.*, 2006 U.S. Dist. LEXIS 90868, at *11-12 (E.D. Cal. 2006) ("Claims sixteen and seventeen are for negligent and/or intentional interference with existing contractual relationships and negligent and/or intentional interference with prospective

1  economic advantage, respectively. Both of these theories are state common law

2  causes of action . . .").

3      In *Torrance National Bank v. The Aetna Casualty & Surety Company*, 251

4  F.2d 666, 669 n.5 (9th Cir.1958), the Ninth Circuit noted that:

5          This Court does not overlook that in some situations a federal court, in
           a diversity suit, may refuse to follow a state supreme court decision. It
6          is not necessary that a case be expressly overruled in order to lose its
           persuasive force. [T]he law is in part an evolutionary process of judicial
7          reasoning. If convinced that the California Supreme Court would no
           longer follow the [relevant] case, then. . . this Court should apply the
8          same standards which it believes the highest court of this State would
           use.
9

10     Therefore, this claim is valid.   Defendant does not dispute the

11  sufficiency of the pleadings as to the cause of action.

12              **4.  Intentional Interference with Contracts (Count 4)**

13     The elements of intentional interference with contracts are: "(1) an economic

14  relationship between the plaintiff and some third party, with the probability of future

15  economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship;

16  (3) intentional acts on the part of the defendant designed to disrupt the relationship;

17  (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

18  proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed

19  Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  The First Amended Complaint, ¶¶ 86-

20  96, adequately alleges facts supporting each of these elements.

21     Youngevity's arguments against the intentional contract-interference claim

22  miss the mark and are not backed by case law. Youngevity complains, without citing

23  any authority, that Plaintiff cannot maintain a cause of action for interference with

24  "*all* of the alleged contracts with Spice Jazz's sales force."  However, Plaintiff is not

25  alleging that Youngevity interfered with "all of the alleged contracts"—only those

26  of the salespeople it improperly recruited away with the active assistance of Ms.

27  Walters, *Plaintiff's CEO*.

28

Moreover, Youngevity does not cite any authority for its proposition that Plaintiff has to enumerate the contracts beyond identifying them as the contracts between itself and its sales force members who left to Youngevity. (It is estimated that 50-100 members of Plaintiff's sales force moved to Youngevity).

Other than specifying that Youngevity interfered with the contracts of the sales-force members who ended up moving with Ms. Walters to Youngevity, it is unclear what else Plaintiff should state, at this point, to identify the particular contracts at issue. The specific identity of Plaintiff's sales reps who moved is in the exclusive possession of Youngevity, and Plaintiff needs discovery to determine all of the representatives Youngevity employed after wrongfully orchestrating the scheme to persuade them to move *en masse* with the help of Ms. Walters, while she was still employed as Plaintiff's CEO.

The First Amended Complaint, FAC ¶¶ 88-89, also sufficiently alleges that Youngevity had knowledge of Plaintiff's contracts with its CEO and with its sales force members.

To be clear: only a small subset of the tortious-interference claims deals with Ms. Walters' contract with Plaintiff (since Ms. Walters' contract with Plaintiff is only one of roughly 50-100 contracts that were interfered with). However, Youngevity's arguments under California law (which does not apply to this question) miss the mark. Plaintiff can sue Youngevity for interfering with Ms. Walters' CEO contract, because this contract is either valid on its face, or reformable under <u>Texas law</u>, which governs its validity.

Ms. Walters' employment agreement contains a Texas choice-of-law clause, stating that the law of Texas, where Plaintiff is headquartered, where Ms. Walters frequently met with Plaintiff's owners, and where she entered into the employment agreement (*see* FAC ¶ 71), should govern any issue related to the validity of the agreement:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**. . . all issues and questions concerning the** construction, **validity,** enforcement and interpretation **of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas**, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.  First Amend. Compl. ¶ 71 (emphasis added).

California law reflects "a strong policy favoring enforcement of" choice-of-law provisions, such as Plaintiff's Texas choice-of-law clause with Ms. Walters. *1-800-Got Junk? LLC v. Superior Court*, 189 Cal. App. 4th 500, 512, 116 Cal. Rptr. 3d 923, 931 (2010) (citing *Nedlloyd Lines B.V. v. Superior Court* 3 Cal.4th 459, 464–465 (1992)).  "**The law of the state chosen by the parties to govern their contractual rights and duties will be applied. . . unless** either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the [parties'] choice, or (b) application of the law of the chosen state **would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state** in the determination of the particular issue and which. . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* at 932 (emphasis added).

In other words, even if Youngevity demonstrates that a fundamental California policy opposes the Texas non-solicitation clause, it must also demonstrate that California has a "materially greater interest" in regulating Ms. Walters' employment relationship with Plaintiff, instead of Texas.

Applying these principles here, there is no reason to set aside the "strong policy" favoring enforcement of the parties' choice of Texas law.  Ms. Walters' employment agreement was entered into in Texas and governed her relationship as CEO of a Texas entity (Spice Jazz LLC) which was also headquartered in Texas. FAC ¶ 71.  Ms. Walters frequently traveled to Texas in her capacity as Plaintiff's CEO, to meet with Plaintiff's owners. *Id.*

1    Meanwhile, <u>California has very little connection</u> to this particular issue.
2    Plaintiff was not headquartered in California, Ms. Walters' employment agreement
3    was not entered into in California, her employment for Plaintiff did not center on
4    California, and ninety percent (90%) of the affected sales force members—who
5    Ms. Walters was prohibited from soliciting—were either in Australia or New
6    Zealand. *Id.*   There is no indication that any substantial number of them were in
7    California.

8    Youngevity fails to articulate a basis to dismiss this claim applying Texas law,
9    and should not be permitted to "sandbag" Plaintiff with new arguments in its Reply.
10   The only portion of Youngevity's brief which addresses Texas law is <u>one sentence</u>
11   <u>at pages 13-14</u>, stating that "under Texas law, a non-compete with no geographic
12   limitation is invalid."  However, the non-solicitation clause at issue here contains an
13   implied geographic limitation, because 90% of Plaintiff's sales force was located in
14   Australia and New Zealand at the time Ms. Walters left.  FAC ¶ 71.  Moreover, the
15   proper remedy under Texas law, if a non-compete or non-solicitation clause fails to
16   specify a reasonable geographic limitation, is to <u>reform</u> the agreement to contain
17   such a limitation, rather than to void the agreement entirely.  *See* FAC ¶ 71; *Tranter,*
18   *Inc. v. Liss*, No. 02-13-00167-CV, 2014 Tex. App. LEXIS 3398, at *20 (Tex. App.—
19   Fort Worth Mar. 27, 2014) (stating that "because Tranter provided evidence that
20   the noncompete at issue is ancillary to or part of an otherwise enforceable agreement
21   and because the noncompete can be reformed to contain reasonable limitations as to
22   time, geographic area, and scope of activity that do not impose a greater restraint
23   than is necessary, Tranter established a probable right to recovery.").

24   Whether the non-solicitation clause at issue here is reasonable, and if so
25   whether Plaintiff can come forward with sufficient evidence that the non-solicitation
26   clause can be <u>reformed</u> to be reasonable, are fact issues, not susceptible to resolution
27   at the pleading stage.  (To be clear, once again, the only issue before the Court is
28   whether the contract is "reformable" and therefore valid, and can support a tortious

interference claim—Plaintiff is not actually asking the Court to issue any Declaratory Judgment reforming the agreement, or impacting any of Ms. Walters' rights or obligations thereunder.  The point is that Texas law recognizes the agreement as valid, or at least not invalid on its face, and the tortious interference claim should therefore be permitted to proceed).

### 5.  Intentional Interference with Prospective Economic Advantage (Count 6)

Youngevity argues that the interference with prospective economic advantage claims must be dismissed for lack of a "wrongful act" by Youngevity, but the First Amended Complaint contains ample allegations of independently wrongful acts by Youngevity, including that <u>Youngevity conspired with Plaintiff's CEO to steal all of Plaintiff's key employees and sales force members</u>, in violation of her still-existing fiduciary duties to Plaintiff.  *See, e.g.,* FAC ¶ 2.

Youngevity complains that "[a] Plaintiff cannot satisfy the independently wrongful act requirement by pointing to alleged trade secret misappropriation because the California Uniform Trade Secret Act (CUTSA) expressly preempts other state law claims." Mem. At 16:10-12.  However, CUTSA "[p]reemption generally applies **where there is no material distinction** between the wrongdoing underlying the CUTSA claim and the non-CUTSA claim.  CUTSA **does not preempt 'other civil remedies that are not based upon misappropriation of a trade secret.'**" *Snelling Servs., LLC v. Diamond Staffing Servs.*, No. A135049, 2013 Cal. App. Unpub. LEXIS 5425, at *53 (2013) (quoting Cal. Civ. Code Section 3426.7(b)) (emphasis added).

In the First Amended Complaint, Plaintiff clarified that both its tort claims, and its equitable request for restitution (in the alternative), are only being pursued to the extent they are based on wrongdoing distinct from misappropriation of trade secrets, such as Youngevity's <u>actively conspiring</u> with Ms. Walters to steal Plaintiff's key employees and sales force members while she was still Plaintiff's

CEO, her continuing to collect a salary from Plaintiff while doing so, and instructing Plaintiff's employees to download their sales contacts and move them to Youngevity (to the extent such sales contacts are not determined to constitute trade secrets).[2]

Because Plaintiff clarified in the First Amended Complaint that its tort claims are based only on wrongdoing that is distinct from theft of trade secrets, there should be nothing left for the Court to dismiss under the CUTSA preemption doctrine.

Youngevity also complains that the Complaint must "specifically identify" prospective economic relationships which were disrupted, citing *Kenner v. Kelly*, 2012 WL 553943 (S.D. Cal. Feb. 21, 2012) and *Nestle USA, Inc. v. Crest Foods, Inc.*, 2017 WL 3267665 (C.D. Cal. July 28, 2017).

However, Youngevity's demand for more specificity than what Plaintiff has provided here misstates the law. Plaintiff is not required to list the names of all individuals who would have been successfully recruited into its sales force in the future, if that sales force had not been decimated by Youngevity's actions.

In *Kenner v. Kelly*, the Complaint merely "allege[d] that 'Kenner runs a business off the Kenner Horse Ranch,'" and the Court unsurprisingly held that "this creates only the possibility that existing or prospective economic relationships existed at the time of foreclosure. Such vague allegations are insufficient . . ." *Kenner v. Kelly*, 2012 WL 553943, 2012 U.S. Dist. LEXIS 21456, at *13 (S.D. Cal. Feb. 21, 2012). Similarly, *Nestle USA, Inc. v. Crest Foods, Inc.* stands for the proposition that "[m]erely referring to customers in general is not sufficient to show a specific prospective business relationship." 2017 WL 3267665, 2017 U.S. Dist. LEXIS 136557, at *42 (C.D. Cal. July 28, 2017).

By contrast, here, the Complaint details the nature of Plaintiff's business operations (with existing sales reps continuously recruiting new ones), and alleges with much more specificity that "Plaintiff was a growing business, with a growing marketing sales force, whose very essence was incentivizing sales force members to

---

[2] *See* FAC ¶¶ 69, 85, 102, 113, 169.

1    recruit new sales force members.   Accordingly, Plaintiff had a reasonable
2    likelihood—indeed a certainty—of entering into profitable economic relationships
3    with additional sales force members as its business continued to grow."  FAC ¶ 103.

4          Plaintiff added more detail by explaining that existing sales force members
5    were incentivized to recruit new members, by being permitted to collect a percentage
6    of their recruits' sales. *Id.* ¶ 14.  Testifying experts in this proceeding will be able to
7    look at Plaintiff's existing record of growth in its sales force, and resulting sales, and
8    extrapolate that record, based on real-world examples of other direct-marketing
9    operations, to establish with a reasonable degree of certainty how Plaintiff's business
10   *would have continued to grow* if it had not been sabotaged.  This allegation—that
11   Plaintiff's business would have continued to grow just as it already had been, before
12   Youngevity interfered—is a far cry from the completely "vague allegations" of
13   *Kenner* and *Nestle*.

14         However, as with the other issues Youngevity raises, if the Court feels that
15   further detail is required to satisfy the applicable pleading standard, Plaintiff
16   respectfully requests leave to amend its Complaint once in response to the Court's
17   ruling, in order to allow its claims to be decided on their factual merits.

18   **6. Negligent Interference with Prospective Economic Advantage**
19         **(Count 5)**

20         The Court should not dismiss the claim for negligent interference with
21   prospective economic advantage ("NIPEA").  Even the line of cases relied upon by
22   Youngevity, to argue that the negligence-based claim for tortious interference *with*
23   *contract* should be dismissed, supports allowing a NIPEA claim.  *See, e.g., Davis v.*
24   *Nadrich*, 174 Cal. App. 4th 1, 9, 94 Cal. Rptr. 3d 414 (Ct. App. 2009) ("In California
25   there is no cause of action for *negligent* interference with contractual
26   relations. While there exists a cause of action for negligent interference
27   with *prospective* economic advantage . . .") (emphasis in original).  Accordingly, the
28   Court should permit this claim to proceed.

### 7. Aiding and Abetting Breach of Fiduciary Duty (Count 11)

A claim for aiding and abetting breach of fiduciary duty requires allegations of: "(1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff." *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014). The First Amended Complaint sufficiently alleges that Youngevity knowingly and materially assisted Ms. Walters in breaching her fiduciary duties. *See* FAC at 29, ¶¶ 155-166. Indeed, the Amended Complaint goes further, alleging that Youngevity directly and actively conspired with Ms. Walters. *See, e.g.,* FAC ¶ 2.

Once again, without citing any case law in support, Youngevity argues that Plaintiff is somehow required to recite all of the actions Youngevity took to "substantially assist" Ms. Walters in breaching her fiduciary duties. That is not required under Rule 8, and Rule 9(b) does not apply.

However, only Youngevity currently has knowledge of all the specific actions it took to conspire with and aid and abet Ms. Walters; at the pleading stage, it is sufficient for Plaintiff to allege that Youngevity aided and abetted her breaches of fiduciary duty, and the full details of Youngevity's actions will emerge during discovery. (In the alternative, if the Court believes that further detail is required, it should grant leave for Plaintiff to amend its pleading one time in response to the Court's ruling).

Youngevity rather inexplicably argues that "the new factual content [in the Amended Complaint] does not support even the inference that Youngevity had *actual knowledge* of Walters' alleged breach of her fiduciary duties." Mem. At 23:18-20. This is hard to comprehend, given that the FAC alleges that Youngevity *actively conspired* with Ms. Walters. *See, e.g.,* FAC ¶ 2.

-23-

More specifically, the First Amended Complaint alleges that:

> At some unknown time and in an unknown manner that will be revealed by discovery, Ms. Walters and individuals at Youngevity, including unknown Youngevity officers and directors, discussed and agreed to a plan through which Ms. Walters would orchestrate the theft of Plaintiff's entire business by moving all of Plaintiff's key sales people and employees and all of Plaintiff's trade secrets from Plaintiff to Youngevity, its direct competitor. Youngevity reached this agreement with Ms. Walters while she was still working as Plaintiff's CEO, and the conspiracy was carefully planned and carried out over many months. *Id.* ¶ 38.

This should be sufficient, at the pleading stage, to adequately plead a claim for aiding and abetting breach of fiduciary duty.

### 8. Unjust Enrichment/Restitution (Count 12)

The First Amended Complaint reframes the unjust enrichment claim as a request for restitution, which is how it should properly be framed under California law.  The Court of Appeals in *Durell v. Sharp Healthcare* explained that:

> '[T]here is no cause of action in California for unjust enrichment.' Unjust enrichment is synonymous with restitution.

> There are several potential bases for a cause of action seeking restitution. For example. . . **restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct.** In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory …

*Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010) (emphasis added).

Under *Durell*, Plaintiff has a basis to demand restitution from Youngevity. Youngevity's "fraud, duress, conversion or similar conduct" included conspiring with Plaintiff's CEO to actively steal all of Plaintiff's key employees and (to the extent they are deemed not to be trade secrets) other assets such as recipes, marketing

-24-

materials and customer lists.

Plaintiff's request for equitable restitution is pled in the alternative and, if for any reason Plaintiff is unable to obtain relief under its tort and statutory claims, it should be permitted, in the alternative, to seek monetary restitution from Youngevity for the value of the benefits Youngevity wrongfully obtained from Plaintiff. *Durell*, 183 Cal. App. 4th at 1370.

## C. If the Court Determines That There Are Any Defects in the First Amended Complaint, It Should Grant Leave to Amend So That Plaintiff's Claims Can Be Judged on Their Factual Merits

Finally, it is for the Court, and not Youngevity, to decide whether amending the Complaint further could cure any defects that exist within the pleading, if there are any. Rule 15 states that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has further strengthened this language through its holding in *Forman v. Davis* that "this mandate is to be heeded. . . In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, *repeated failure* to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962) (emphasis added). Plaintiff respectfully requests an opportunity to amend its Complaint once in response to the Court's ruling, if the Court believes that defects exist in the FAC that could be cured through amendment.

## IV.

## CONCLUSION

For the reasons stated above, Defendant Youngevity International, Inc.'s motion to dismiss should be DENIED.

Respectfully submitted,

**SBAITI & COMPANY, PLLC**


*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti
State Bar No. 275089
1201 Elm Street, Suite 4010
Dallas, Texas 75270
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com

**Counsel for Plaintiff**